# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 85

APRIL TERM, A.D. 2021

*July 26, 2021*

IN THE INTEREST OF:  RR, KR and
RR, minor children,

FR,

Appellant
(Respondent),

v.                                                                    S-20-0219

THE STATE OF WYOMING,

Appellee
(Petitioner).

*Appeal from the District Court of Laramie County*
*The Honorable Catherine R. Rogers, Judge*

*Representing Appellant:*
    Hannah West of McKellar, Tiedeken & Scoggin, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
    Bridget Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney
    General; Jill E. Kucera, Senior Assistant Attorney General; Shawnna M. Lamb,
    Senior Assistant Attorney General.  Argument by Ms. Lamb.

*Guardian Ad Litem:*
    Joseph R. Belcher, Director, and Kimberly Skoutary Johnson, Chief Trial and
    Appellate Counsel, Wyoming Office of Guardian ad Litem, Cheyenne, Wyoming.

*Before FOX, C.J., and DAVIS*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\* Chief Justice at time of oral argument.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Justice**.

[¶1]    FR is the father of three children, who were seven, five and four years old when the State of Wyoming filed a petition in juvenile court that alleged FR neglected the children. FR challenges the court's order adjudicating the children as neglected and its order changing the permanency plan for the children from reunification of the family to termination of FR's parental rights and adoption.  We affirm.

## ISSUES

[¶2]    The dispositive issues are:

> 1.    Did the juvenile court's failure to insure FR's presence at the adjudication hearing deprive it of subject matter jurisdiction to rule on the children's permanency?
>
> 2.    Did the juvenile court violate FR's right to due process when it failed to insure his presence at the initial hearing, failed to advise him of his rights at the initial hearing, and failed to insure his presence at the adjudication hearing?
>
> 3.    Did the juvenile court abuse its discretion when it found that the Department of Family Services (DFS) had made reasonable efforts at reunification and that the permanency plan for the children should be changed to adoption?
>
> 4.    Did the juvenile court commit cumulative error?

## FACTS

[¶3]    At 2:43 a.m. on April 11, 2019, FR called the Cheyenne Police Department and reported that his children were out of control and that he needed help with them.  Officer Jose Ruiz and another officer responded to the call, and FR allowed them into the home. FR told Officer Ruiz that he had fallen asleep at around 10:00 p.m. and "the kids just went crazy" and made a huge mess while he was sleeping.

[¶4]    During the welfare check, the officers searched for any outstanding arrest warrants and found one for FR's failure to appear for a child support hearing.  They then took him into custody, and because no one was available to care for the three children, Officer Ruiz contacted DFS to take them into protective custody.

1

[¶5]    On that same day, the State filed a petition alleging that FR had neglected his three children: RR (age 7); KR (age 5); and RR(B) (age 4).[1]  The petition generally alleged neglect as the term is statutorily defined, and it also referenced Officer Ruiz's affidavit of probable cause for each child.  The affidavits stated that FR called police and reported his children being "out of control."  They further stated that upon FR's arrest, officers were unable to contact a responsible adult to care for the children, and DFS was therefore notified.

[¶6]    Also on that same day, FR's court-appointed attorney entered her appearance, and the juvenile court held a shelter care hearing.  FR appeared at the hearing, not with his court-appointed attorney, but with an attorney from her office who was covering for her.  The court noted FR's presence, but it did not advise him of his rights as required by the Child Protection Act.[2]  The court instead, without objection, proceeded directly to receiving the State's evidence concerning the circumstances under which the children were taken into shelter care.

[¶7]    The State presented the testimony of Officer Ruiz and the two DFS caseworkers who responded to the call, Brianna Gray and Ashley Dennis.  Officer Ruiz testified concerning the circumstances of FR's call for help and his report that his children were out

---

[1] The oldest of the three children is a girl, and the youngest is a boy.  Because they share the same initials, we will refer to the boy as RR(B) when necessary to distinguish between them.

[2] Section 409(b) of the Act requires:

> (b) At the commencement of the hearing the judge shall advise the child and his parents, guardian or custodian of:
>
> (i) The contents of the petition and the nature of the allegations contained therein;
>
> (ii) Their right to counsel as provided in W.S. 14-3-422;
>
> (iii) The right to confront and cross-examine witnesses or to present witnesses and evidence in their own behalf and the right to issuance of process by the court to compel the appearance of witnesses and the production of evidence;
>
> (iv) The right to a jury trial as provided in W.S. 14-3-423;
>
> (v) The right to appeal as provided in W.S. 14-3-432; and
>
> (vi) The state's obligation, pursuant to W.S. 14-3-431(d), to file a petition to terminate parental rights when a child has been placed in foster care under the responsibility of the state for fifteen (15) months of the most recent twenty-two (22) months unless the court finds that one (1) of the exceptions listed in W.S. 14-3-431(m) applies.

Wyo. Stat. Ann. § 14-3-409(b) (LexisNexis 2021).

of control. He further testified that he received permission to look through the home, and he described what he found as follows:

> When you enter the apartment there's a living room area, there's a kitchen off to the left. In the living room area there was food on the floor. There was cheese, there was spaghetti noodles. Piles of clothes. Not sure what it was, it may have been some sort of animal bedding on the floor. There were two smaller children lying on the floor in the middle of the living room. They were later identified as [RR(B)] and [KR]. After speaking with [FR], the defendant, he had stated while he was asleep, and he had fallen asleep around 10:00 p.m., the kids just went crazy, in his words. He also stated the residence was clean prior to him going to bed. I asked if I could look around and he gave me consent to.

> From the living room there's a hallway that goes towards the back of the apartment. There's a couple of rooms off to the right. I asked him which room he was in. He said he was in the first room off to the right-hand side. That's where he was sleeping at the time his kids were destroying the house.

> Going through the hallway there was a lot of clutter, clothing, shoes, toys, things of that nature. I went into the room where [FR] said he was asleep in and in that room there were cigarettes (sic) butts all over the floor. There was ash. Same type of thing, there were shoes, there was clothing, there was just items everywhere.

> I asked him, you know, how he ended up waking up during the incident. He said his four-year-old son, [RR(B)], had come into the room and started going crazy in there and that's what woke him and that's how he discovered the mess in the house.

> Across from his room is the bathroom. In the bathroom there was a tote of dirty dishes. The toilet appeared to be clogged and the bathtub had some standing water in it and also some dishes. There was another room at the very end of the apartment complex and that had chairs, it had doors, it had a lot of other items just stacked in front of the door. And directly across from that was another room that was basically empty. It wasn't as cluttered as the other ones I was in.

3

[¶8]    On cross-examination, Officer Ruiz testified:

> Q.    Was there any indication the house had been unclean for more than a period of time that [FR] said it was unclean for?
>
> A.    Just based on experience, I would say yes. I mean, again, there was clutter everywhere. Some of these items he had claimed that the kids moved. One was a sofa – or like a reclining chair that he stated the kids had flipped over. With the size of the kids, I don't know how it would be physically possible for them to flip that chair.
>
> Q.    What is the size of the kids?
>
> A.    They are fairly small. Skinny but not malnourished.
>
> Q.    Okay. Anything in your meeting with [FR] give you an indication he was physically abusive toward the children?
>
> A.    No.
>
> Q.    Okay. That he did not care for the children?
>
> A.    What do you mean? Define not care.
>
> Q.    Does it seem like he's a caring father?
>
> A.    He was asking for help.
>
> Q.    Okay.
>
> A.    That's what he said the reason for the call was, that he needed help with the kids.
>
> Q.    Okay.

[¶9]    Brianna Gray, one of the DFS caseworkers, also testified as to the condition of the home. She described the kitchen as incredibly dirty, and testified that the floor in the home was cluttered with piles of clothing, shoes, food, trash, and miscellaneous items and debris. She also testified that Officer Ruiz's partner cautioned her against taking many items of clothing from the home because he was concerned that they may have bugs on them. Concerning the children's condition, she testified:

4

Q. You said the kids indicated they didn't know the last time they ate?

A. No. So when we were talking about taking the kiddos with us to the foster home, Officer Ruiz's partner had said that the kids had told them that they were hungry. I asked [RR] when was the last time she ate and she wasn't able to tell me. We got them McDonald's and they each ate three pancakes in a very quick amount of time.

Q. Did they seem to be hungry?

A. Yes.

[¶10] Ashley Dennis, the other DFS caseworker, confirmed the uncleanliness of the home, and her photos of it were received into evidence. She further testified that she did not believe that the mess in the home could have been recently created.

[¶11] Substitute counsel for FR did not present evidence at the shelter care hearing, but after the State rested, he requested that the children be returned to FR. The juvenile court denied that request. It reasoned:

There is no question in my mind knowing [FR] and the efforts he went through in the previous juvenile proceeding that [FR] loves his children, that he loves them passionately, and that he has worked and will continue to work very hard to be a part of their lives and a constructive supportive part of their lives. Those all are very separate propositions from what happened in the last 24 hours. And receiving evidence today and hearing the testimony that I have heard, I do conclude that the State should be relieved of any obligation it may have had to undergo reasonable efforts to avoid removal under the circumstances of the children. But I also conclude – and that shelter care was appropriate at the time. I also conclude at this time it would be contrary to the children's best interest to be returned immediately to [FR's] physical or legal custody.

The fact alone that any parent would call law enforcement at 2 o'clock in the morning for help with his three children, the youngest of whom is four and the oldest of whom is seven, would suggest to me that there's a problem in this household. And the problem doesn't have so much to do

5

specifically or individually with the fact of the dirty house or the fact of lack of resources, but rather that we've got a parent who again has found himself in the position of being overwhelmed [and] thus unable to appropriately and effectively parent in a way that – and manner that is in the children's best interest focusing on their safety. And for that reason alone, again because of [sic] [FR] elected to seek the assistance of law enforcement in the middle of the night to parent his children, I think that the children need to remain in the State's custody unless and until alternate arrangements can be made and that [FR] has had an opportunity to engage in rehabilitative efforts on his own.

[¶12]   On April 16, 2019, the juvenile court entered its shelter care order, which directed that legal custody of FR's children would be with the State and physical placement would be at the discretion of DFS.  It further ordered that DFS provide services in accordance with a case plan of family reunification.  FR did not appeal the shelter care order.

[¶13]   Also on April 16, the juvenile court issued an order setting FR's initial appearance for May 16.  FR was not served with notice of the hearing, but apparently knew of it, as he tried to appear by telephone.  His appointed counsel was present, and the following occurred:

> THE COURT:        We are scheduled to conduct an initial appearance in Docket 15-407, In the Interest of [RR], [KR], and [RR(B)]. [FR] is not here. [His attorney] just notified me I think probably off the record that [FR's] ride to court fell through. He had hoped to perhaps be allowed to participate by telephone at the last minute, but [his attorney] intends to provide the Court with a denial on his half and request a bench trial.
>
> I think under the circumstances it would probably be the most expeditious approach to simply accept that denial and set the matter for a bench trial. I will make a finding that based on the Court's docket and my personal calendar that it would be appropriate and in the interest of justice to extend beyond 60 and no more than 90 days the date upon – after filing the date upon which the case must be adjudicated which would be roughly July 11th. So we will look for a time on the calendar between now and July 11th to get this matter set for a bench trial.

[¶14]  The juvenile court then requested an update on the children, and the guardian ad litem (GAL) reported:

> I have been able to visit the children. They are doing well in the nonrelative home. They really were relaxed, seemed comfortable and happy in the environment. . . .
>
> But yeah, there are some things that have revealed themselves through this process as to their hygiene not being very good, hadn't been for a while. And additionally, potential other neglect issues concerning food. The children are showing a lot of food insecurity, hoarding, binging, eating adult portions, things like that. Just some concerns that I think are revealing themselves that there may have been – just kind of a whole general neglect situation happening with the home and those kinds of things.
>
> I'm concerned whether Dad may be depressed [or] if there is issue that way that he needs help so that he can feel better and he can stay on top of things with the kids a little more.

[¶15]  The juvenile court orally ruled that under the circumstances, it would be contrary to the children's best interest to be returned to FR's legal or physical custody.  It directed that legal custody of the children remain with DFS, with physical placement at its discretion in consultation with the GAL.  It further directed that the permanency plan remain family reunification.

[¶16]  On May 20, 2019, the juvenile court entered its written order upon initial hearing, which memorialized FR's denial and the court's oral rulings.  The order also stated that the court had explained the allegations of the neglect petition to FR and advised him of his constitutional rights, though that had not occurred.[3]  FR did not appeal the order upon initial hearing.

---

[3] Section 426(a) of the Child Protection Act requires as follows:

> At the initial hearing, the child and his parents, guardian or custodian shall be advised by the court of their rights under law and as provided in this act. They shall also be advised of the specific allegations in the petition and given an opportunity to admit or deny them. They shall also be advised of the possible liability for costs of treatment or services pursuant to this act.

Wyo. Stat. Ann. § 14-3-426(a) (LexisNexis 2021).

[¶17]   On May 21, 2019, the juvenile court issued an order setting the adjudication hearing for June 28.  Law enforcement made two unsuccessful attempts to serve FR with the order at his apartment, and FR did not appear for the hearing.  FR's appointed attorney did not appear, but another attorney from the same law office covered and appeared on his behalf.  The court asked her about FR's absence, and she reported, "He was aware of today's hearing. I wasn't told that he wasn't going to be here."

[¶18]   Counsel for the State informed the court that the parties were prepared to offer a consent decree, but in light of FR's failure to appear, she asked that the court enter a default and accept an offer of proof.  The court responded:

> So rather than even making offers of proof, I'm inclined to just take adjudicatory notice of that evidence I've already received. I suppose the only concern about that might be that the rules of evidence would apply to the adjudicatory hearing and did not apply to the shelter care hearing. I can't think of any evidentiary struggles or challenges or concerns from the shelter care hearing. It wasn't like there was hearsay or anything that I shouldn't be taking into consideration. It was eyewitness testimony about the conditions of the residence.
>
> And [counsel for FR], I'll give you one more opportunity to be heard on FR's behalf and I don't intend to suggest that you can or should say anything other than what you've already said, just you represent him and I don't want to box you out before I do what I think I need to do.

[¶19]   FR's attorney did not object, offer evidence, or make an offer of proof as to any evidence FR would have offered if he were present and an evidentiary hearing were held.  The juvenile court then ruled based on the testimony at the shelter care hearing and the photos of the home admitted during that hearing that "these children are neglected children as a result of conduct by [FR] . . . ."  The court ordered DFS to complete a dispositional report, that a multidisciplinary team (MDT) meet to generate recommendations, and that the matter be set for a dispositional hearing within sixty days.  The court further ordered that FR report to LifeNet for an initial assessment for its home-based services by 10:00 a.m. on July 1, 2019.

[¶20]  The juvenile court issued a written order arising from the adjudicatory hearing, which memorialized its adjudication and custody and placement rulings.[4]  FR did not appeal that order.

[¶21]  On July 5, 2019, DFS filed a notice of update regarding the LifeNet services. It wrote:

> This letter is to inform you of the status of the Life[N]et Homebased Services that [FR] was ordered to comply with. On June 28, 2019, during an adjudication hearing, [FR] was ordered to comply with an appointment on July 1, 2019 at 10:00a.m. with Life[N]et to begin Homebased Services; [FR] was ordered to show up at the Life[N]et office for the appointment. DFS notified [FR] of this order on June 28, 2019 via email communication, through two separate emails. [FR] responded to the Departments [sic] communication stating he received the information and would get a hold of Life[N]et (See attached correspondence). DFS was informed that the CASA assigned to the case also informed [FR] of the requirement during her home visit on June 29, 2019. Furthermore, DFS was informed by [FR's] attorney of record that her office had also informed [FR] of the requirement through a phone call made to [FR] on June 28, 2019.
>
> On July 1, 2019, DFS was notified that [FR] did not attend the scheduled appointment with Life[N]et. DFS was later notified that [FR] did place a call to Life[N]et around 1:10pm on July 1, 2019. Life[N]et returned [FR's] phone call on the morning of July 2, 2019 and as of noon on July 3, 2019 had not heard back.
>
> On July 3, 2019, mid afternoon [sic], DFS took Life[N]et to [FR's] home unannounced. [FR] opened the door and allowed us in the home. He spoke with Life[N]et about beginning services. He is scheduled to be brought to DFS by Life[N]et on Monday July 8, 2019 at 3:15pm to review the case plan, and is scheduled on Tuesday July 9, 2019 at 1:00pm to begin working homebased services with Life[N]et.

---

[4] The record does not reflect the reason for the delay, but the order upon adjudicatory hearing was not entered until August 21, 2019.

[¶22]   On July 17, 2019, the MDT held its first meeting, which both FR and his appointed attorney attended in person.  The MDT report noted that the children had been returned to FR on June 18 for a trial home placement, and FR reported that he felt "things were getting better day by day."  He indicated that he had talked with LifeNet about getting some beds and that he was seeking part-time employment.

[¶23]   The court-appointed special advocate (CASA) reported that she had been able to provide FR with a vehicle and that all he needed to do was obtain insurance and have it plated.  The team members who had been in FR's home reported that its condition had improved and there were no safety concerns with it.  The MDT did not reach a unanimous recommendation, but DFS, the State, and FR's attorney agreed that: legal and physical custody should remain with DFS; placement should be at the discretion of DFS, in consultation with the GAL; and the permanency plan should be changed to family preservation.

[¶24]   A few weeks later, on August 9, 2019, the Cheyenne Police Department received a report of three unattended children.  Officers responded and found FR's three children playing outside with other children.  They then located FR in his apartment, and he allowed them to come in.  Officer Fardella reported his observations and what occurred next:

> During conversation with [FR], he allowed Officer Wood and I into his residence. The apartment was extremely messy and unsanitary, which caught my attention. There was trash on the floor, kitchen was dirty, empty beer cans all over the counter with cigarette butts on the cans, dishes were not cleaned and stacked all over the counter space, there were stains, miscellaneous materials, and dirt material all throughout the carpet flooring in the living room and hallway area, open milk containers (with milk) left out, old food left on plates in the kitchen area and laundry area, canned food that was left open, some of which looked aged, the bedrooms were dirty and not in livable condition, other than the main bedroom. Although not clean, the master bedroom was the only room that had a bed in it. [FR] stated everyone slept in one bed, however, the bed did not have any sheets.
>
> The bathroom was filthy. The sink area was very dirty, there was feces left in the toilet and not flushed, and the bath tub was very dirty. The tub appeared like it had not been run for at least two to three days. [FR] stated the kids were in Department of Family Services (DFS) custody, but they had been placed with him earlier this summer. I contacted DFS and spoke to Kirbie Brown. Brown was familiar with the [R] family, and stated that

10

the assigned case manager won't be back until Monday. I expressed my concern about the living conditions to Brown, and she stated that she would be by to pick up the children.

Brown arrived at 1850 hours, and she spoke with [FR]. Brown asked [FR] if she could go into his apartment for investigative purposes, and [FR] denied her request. [FR] stated that he wanted to consult with his lawyer. Since the three children were already in DFS custody, Brown took [RR(B)], [RR], and [KR].

[¶25] On August 14, 2019, DFS filed a notice of change in placement that informed the juvenile court that the children had been placed together in non-relative foster care. On that same date, DFS filed a predisposition report with the court. The report noted that the DFS caseworker went over the case plan with FR on July 8, and that he took it and signed it after going over it with his attorney. The report also indicated that since the adjudication in this case, "there has been minimal progress."

[¶26] On August 15, 2019, the juvenile court held a dispositional hearing, and FR appeared in person with his appointed attorney. FR's attorney acknowledged the setback with the recent removal of the children from FR's home and indicated that he was more open to services than he had been in the past. She indicated his willingness to work toward a plan that would resolve the matter in a way that would be "sustainable long term."

[¶27] On August 28, 2019, the juvenile court entered its final disposition order. The court found that returning the children to FR's home would be contrary to their best interest, and it ordered legal custody to remain with DFS and physical placement to be at the discretion of DFS in consultation with the GAL. It further ordered that the permanency plan would be family reunification.

[¶28] On September 17, 2019, the MDT met again, and FR attended in person, though his attorney was unable to attend. FR was advised that he was not required to provide an update or speak during the meeting since his attorney was not present, but he chose to do so. He reported that things were going smoothly, and that he was working on a visitation schedule with the children.

[¶29] The team members who had been working with FR reported positive improvement. The CASA reported that FR had "turned an about-face," was "reaching out for help," and "was working hard to get his apartment ready" for the children's return, and the LifeNet team member agreed. The DFS caseworker likewise reported that the apartment was the cleanest she had seen it, and that case plan objectives were being met. She also reported, however, that she wanted to move slowly with any transition of the children back into the home to ensure that they would be able to remain upon their return. The MDT

recommended that legal custody of the children remain with DFS, with physical placement to remain at the discretion of DFS, in consultation with the GAL. It further recommended that the permanency plan remain family reunification.

[¶30] Two days later, on September 19, 2019, the juvenile court held a six-month review hearing. FR's appointed attorney appeared in person, and FR appeared by telephone because he had been arrested for failure to pay a citation for driving without insurance. The court noted that other than the setback of the arrest, the MDT report indicated positive progress. Counsel for the State agreed and also agreed with the MDT recommendations. The DFS caseworker added:

> Your Honor, the only thing that we want to really emphasize is that even though our risk and safety assessment show that the home is safe and that there is a low risk as to what's being assessed, there is a pretty high risk with the children being removed again if we return them too quickly.
>
> * * * *
>
> So we just kind of wanted to take our time and make sure that we're making sure that [FR] has everything he needs so he's not overwhelmed because we certainly don't want the children to get removed.

[¶31] FR's attorney agreed with the MDT's recommendations. She further commented:

> [FR] is doing really, really well. He is working really hard. I think this has been a bit of a blessing and a curse, but this has allowed him an opportunity to utilize those resources, have a bit of a break from the children, which can be overwhelming, to utilize his resources and sort of get back on track and get to where they can have stability long term. Things are going well.

[¶32] On September 20, 2019, the juvenile court issued an order upon the six-month review hearing. The court found that returning the children to FR's home at that time would be contrary to their best interests and that reasonable efforts to reunify were being made. The court ordered legal custody to remain with DFS, with physical placement at its discretion, in consultation with the GAL. It further ordered that the permanency plan remain family reunification.

[¶33] On December 18, 2019, the MDT met for a nine-month review, and FR attended in person with his court-appointed attorney. The MDT report noted that the children's mother

had been located at the Laramie County Detention Center, where she was incarcerated, and that a case plan had been prepared for her. With respect to FR's progress, team members reported difficulties in communicating with him, difficulty in obtaining access to the home to ensure its safety, concerns that the children were not being adequately fed during visits with him, and that he had become "very resistant" to services and aggressive towards the team. The report also noted that the children's maternal grandparents had been approved as an option for foster placement.

[¶34] FR expressed his own frustrations with communications and denied that the children were not being adequately fed when they visited him. The report also noted that FR stated that he "wanted to put in an appeal in June 2019, but he never heard back and felt it was too late."

[¶35] The MDT recommended that legal custody remain with DFS, with physical placement at its discretion, in consultation with the GAL, and that the permanency plan remain family reunification. The State and GAL agreed to placement with the maternal grandparents, but FR and his attorney objected to that recommendation.

[¶36] On January 3, 2020, DFS filed a notice of change in placement, which informed the juvenile court that the children were being transferred from non-relative foster care to relative foster care with their maternal grandparents. The notice indicated that the decision had been made in consultation with the GAL and that the change in placement would occur on January 17, 2020.

[¶37] On January 30, 2020, FR's appointed attorney filed a motion to withdraw as counsel on the ground that FR had terminated her services. On February 20, 2020, the juvenile court held a hearing on the motion which FR attended in person. The court advised FR that it set the hearing to find out if he wanted another attorney appointed to represent him, and it informed him that another attorney was in the courtroom and prepared to accept the appointment. FR indicated that he would like another attorney, and the court informed him he was at risk of losing his children because of the lack of progress in the case, and that it expected him to cooperate with the newly-appointed attorney. FR responded that he understood the need to cooperate.

[¶38] On February 20, 2020, the juvenile court entered orders allowing FR's attorney to withdraw and appointing new counsel for FR. On February 26, the MDT met for a permanency review, and FR attended in person with his appointed attorney. The MDT report contained the following summary of the comments from FR's attorney:

> [FR] made arrangements to attend therapy. He is starting over at ground zero, and he needs to figure out what is best. He has found a temporary job . . . mowing lawns and doing landscaping. He is working on getting the registration for his

13

car. [FR] will attend Father Factor for the first time tonight. There was a little delay until April for [FR] to do the Parental Capacity Evaluation with Dr. Turlington. [FR] is happy to follow through with the evaluation, see where he is struggling and why things are so difficult for him.

[¶39]   The report also contained a summary of the comments from Britteny Thaler, the DFS caseworker, which included the following:

Britteny reported the MDT was for a Permanency Review. The case is almost 12 months old; the Permanency Hearing is March 19, 2020. Britteny noted there had not been a lot of progress on the Case Plan. Brittney commented, "The case has fluctuated with where the case began. [FR] has lost his home and has to be out Saturday [February 29, 2020][5]. DFS has put in services to address the issues, LifeNet and Goodwill. [FR] has not been willing to participate. It has been six months, and he was not successful. I have no doubt the children love [FR], and [FR] loves the children. I believe he can provide for and keep them safe on a short-term basis. The question is, can he do it long-term? If we ignore [FR's] lack of participation, the likelihood is the children will be removed if placed with him. They will likely be back in a new case. Services have not been successful in the prior case as well. In this case, the services were not wildly successful. Services are removed, and, ultimately, the children are removed."

Brittney continued, "Looking at things as a whole, it's concerning. These kiddos have gone through a lot. The kiddos deserve permanency. I am glad he wants to do the Parental Capacity Evaluation because it is clear to me something is missing. A piece of the puzzle is missing, and none of us know what that is. The kids are doing well. . . .  All three children are very, very smart. They have fierce love and loyalty for their dad. DFS has been concerned when the kids say they can't talk about what happens when they are with their dad. [KR] said dad would go to jail if they said anything. We want therapists and grandparents to be their trusted places. I can't get a picture of the missing piece."

---

[5] Bracketed date in original.

[¶40]   All team members agreed that legal custody of the children should remain with DFS, with physical placement in its discretion, in consultation with the GAL. DFS recommended a change in permanency to guardianship, while Father and his attorney contended that the permanency plan should remain family reunification.  The GAL abstained from any recommendation pending additional information from the children's therapists, but expressed that she was torn between a change in permanency to guardianship or a change to adoption.

[¶41]   On March 2, 2020, FR, through his attorney, filed an unopposed motion to continue the permanency hearing scheduled for March 19 and a request for an evidentiary hearing on permanency.  The motion noted that both counsel for FR and the children's mother were only recently appointed and each required more time to prepare for the evidentiary hearing. FR's counsel further stated that she "continues to implore [FR] to meet with her outside of a team meeting so that the two may adequately prepare for the Permanency Hearing."  The motion also noted that the parties still wished to proceed with a disposition hearing on March 19.

[¶42]   On March 5, 2020, DFS filed a permanency hearing report with the juvenile court. The report included DFS' recommendation that the permanency plan be changed to guardianship and further stated:

> While at the present time, all three children have been in DFS custody for 15 of 22 months,[6] there are periods of that time that the children have lived with [FR] (both in DFS custody and out of DFS custody). The Department recognizes the extreme love and bond [FR's] child[ren] have towards him and the love he has towards his children. While there are several high risk factors that continue to go unaddressed by [FR] and a continual pattern of neglect, even while this case has been open, the Department is not recommending termination of parental rights. The biggest reason being, that the Department fears that legally severing the parent/child relationship between [FR] and his children would be detrimental to the children. DFS believes that the children's need for stability, consistency, safety, and well-being can be met through a guardianship with their maternal grandparents.

---

[6] Only eleven months had elapsed since the filing of the neglect petition in this case when DFS filed this report. We assume that it was referring to the combined time that the children were in DFS custody under the current and prior neglect petitions when it reported that the children had been in DFS custody for 15 of the last 22 months.

15

[¶43]   On March 17, 2020, DFS supplemented its permanency report with an exit summary from LifeNet's home-based services. LifeNet identified the following concerns it had after working with FR:

- [FR] was not motivated or committed to finding employment and was inconsistent on attempts and follow through.

- [FR] did not have legal transportation.

- [FR] blames everyone else for his shortcomings and expected DFS and LifeNet to do anything and everything for him at a moment's notice, but then would suggested [sic] no one was doing anything to help him.

- [FR] declined all help to clean and organize his home which could have impacted his mental health and stress.

- [FR] declined therapy for himself.

- [FR] has a lot of conspiracy theories that impact his ability to trust the system and its process.

[¶44]   In its exit summary, LifeNet recommended that:

- [FR] complete a parental capacity evaluation and a mental health evaluation and follow all recommendations made.

- [FR] participate in parenting classes to better learn how to manage three children and their behaviors.

- [FR] seek and maintain employment and develop a realistic budget.

- [FR] obtain license plates, registration, and vehicle insurance.

- [FR] obtain safe and stable housing for himself and the children.

[¶45]   On March 19, 2020, the juvenile court held a twelve-month review hearing, which FR attended with his appointed attorney.  The court noted that the hearing was scheduled

16

to include a permanency hearing, but because FR requested an evidentiary hearing on permanency, that portion of the hearing would be continued. The court expressed concern with the logistics of holding an evidentiary hearing by the April 11, 2020 one-year permanency deadline because of COVID-19 pandemic restrictions, but it was also concerned that a delay might impact federal funding for services. All parties agreed that under the circumstances, an available course would be to schedule the evidentiary hearing past the April 11 deadline, and in the meantime to order that the permanency plan remain family reunification.

[¶46] During the hearing, FR's attorney informed the court that the team members believed that FR would benefit from a parental capacity evaluation, but Medicaid would not pay for it without a court order requiring the evaluation. The court indicated that it would need a motion to support such an order and asked the parties for their input. The GAL expressed concern that the evaluation would delay the evidentiary hearing and permanency, and the court agreed and indicated that it would consider the matter in conjunction with the evidentiary hearing. The court added:

> Well, if a motion comes in, I'll deal with a motion, but at this point I'm not ordering anything and I'm going to conduct a permanency hearing and evidentiary permanency hearing sometime in May to early June. And if separately I'm approached properly about ordering a parental capacity evaluation, I'll take it into consideration. But again, it may turn out to be somewhat of a moot issue depending on the decision I make at the permanency hearing, which at this point I think needs to occur . . . .

[¶47] FR's attorney did not object to the court's approach to the parental capacity evaluation. The court thereafter issued its twelve-month review and permanency order, which found that reasonable efforts to reunify were being made, and that returning the children to FR at that time would be contrary to their best interest. The order directed that legal custody remain with DFS, with physical placement at its discretion, in consultation with the GAL. It further ordered that the permanency plan remain reunification with FR. The court also entered an order continuing the evidentiary hearing on permanency and setting it for May 27.

[¶48] On May 27, 2020, the juvenile court held the evidentiary permanency hearing. Due to COVID-19 concerns, the hearing was held via videoconferencing, with FR's appointed attorney appearing by video. FR initially participated by video but then consented to participating by telephone due to technical issues. The children's mother appeared by telephone from the county detention center.

17

[¶49] The court heard from several witnesses. The DFS caseworker, Brittney Thaler, testified that DFS provided greater services to facilitate reunification in this case than in any other case she had worked, and that FR consistently resisted those services. She also testified to the limited progress FR made in his case plan. A LifeNet representative testified similarly to multiple services offered and refused by FR. Additionally, the children's separate therapists testified to the children's need for stability and consistency, as well as FR's unwillingness to accept services that could help achieve sustained improvement in his ability to provide that stability and consistency. The court also heard from FR and the children's mother.

[¶50] At the close of the evidence, FR asked for a permanency plan of family reunification, while the children's mother favored guardianship with her parents, with whom the children were already placed. The State and the GAL both advocated for a permanency plan of adoption. FR's attorney also renewed her request that DFS be ordered to obtain a parental capacity evaluation for FR. The court took the matter under advisement and scheduled a hearing to announce its decision two days later.

[¶51] At the decision hearing, the court announced its decision to change permanency to termination of both parents' rights and adoption. As to FR, the court explained:

> As it concerns [FR], I also conclude that there has been no progress on the case plan. There has been some, but I consider it minimal. And this comes in the context of Ms. Thaler's testimony that she has provided extra services from the Department of Family Services.
>
> In fact, her testimony was that she's provided [FR] more services and supports than any other case she can think of in the time that the case has been opened to assist him in completing the case plan. He's had a number of – significant volume of opportunities to have visits with the children.
>
> And, in fact, very early on in this case, he had about a two-month trial home placement which ended in him being arrested and the children coming back into custody. And in addition to that, we've got a situation in which the house, in which he was residing, sort of vacillated between being clean and having a reasonable amount of food and other resources for the children and being unsanitary to the point that law enforcement instructed the Department of Family Services that the children couldn't return to the home.

We've got additional resources provided to [FR] both from CASA and by LifeNet in the form of transportation, access to food banks, clothing, food, even a vehicle from CASA. Help in securing a birth certificate that was almost immediately lost by [FR], even home cleaning, you name it, in the form of support by the department, by CASA, and by LifeNet.

But even with all of those support[s] over an extended period of time, [FR], in the Court's estimation, never once got his legs under him in any meaningful sense to make any of those things happen on their own and on a continuing basis into the future.

And, in fact, the testimony – there was abundant testimony at the permanency hearing, the evidentiary hearing this week that [FR] resisted and combated and avoided and evaded numerous individuals and entities' efforts to provide him that assistance.

* * * *

There's no question at this point that [FR] has not been able to sustain safe and stable housing. He lost his housing recently. And, again, testimony at the evidentiary hearing is that the status of that housing was variable at best as it concerns both the sanitation and safety for the children.

Of course, [FR] did make progress, as he testified at the evidentiary hearing, and that he recently secured employment, although I will observe that that wasn't even a case plan but [FR] nonetheless secured employment.

The problem, of course, being that he can't start working because he doesn't have identification, even though, during the course of the case and the case plan, other individuals have provided him assistance in securing proper documentation for work purposes and for other purposes.

All of those facts in total plus additional facts, not every one of which I will mention or rehash from the evidentiary hearing lead me to conclude that [FR] as a parent is not safe and is not fit to parent the children. And it causes the Court to

19

conclude that it would not be in the children's best interest to be returned to [FR's] care and custody.

I will also just observe that the proposal presented by [FR] at the evidentiary hearing or the suggestion through cross-examination with witnesses, was that the Court continue the permanency plan of family reunification and instruct the department to commissioning [sic] and complete a parental capacity evaluation concerning [FR].

In the Court's estimation, that would result in even more months during which the children are denied permanency, and the real concern of mine in this proposal is that it would shift the burden, making it incumbent on the department, which already has provided extraordinary services and support to [FR] – more according to Ms. Thaler than any other case she's worked – to, then, take it even a step further and grasp at straws in an effort to identify whether additional services and/or support would support reunification of the family.

But it's not the department's obligation to uncover every stone while the parent stands by and watches, effectuating little or no change in his own life and waiting for the department to craft a magic recipe for his success.

The department is required by the statute to undergo reasonable efforts and it has. In fact, it has undergone extraordinary efforts. It's really [FR's] efforts which to date has [sic] not been reasonable under the circumstances.

As a result, I have concluded that the most appropriate – and in the children's best interest – permanency plan moving forward would be termination of [FR's] parental rights and adoption of all three children.

[¶52]  On July 23, 2020, the juvenile court issued an order memorializing its oral ruling, followed by an amended order on August 11, 2020.  FR timely appealed the order to this Court.

20

## DISCUSSION

### A.  Juvenile Court's Jurisdiction to Order Permanency

[¶53]  FR contends that because the juvenile court failed to insure that he was present for the adjudication hearing, it lacked subject matter jurisdiction to order a change in permanency.  FR did not raise this issue below, but "[w]e have long recognized that subject matter jurisdiction is an issue that can be raised at any time by any party or the Court." *In re L-MHB (L-MHB II)*, 2018 WY 140, ¶ 9, 431 P.3d 560, 564 (Wyo. 2018) (quoting *Matter of Mears*, 2018 WY 109, ¶ 17, 426 P.3d 824, 828 (Wyo. 2018)).  "We review whether a court has jurisdiction over a case de novo." *Interest of BG*, 2019 WY 116, ¶ 6, 451 P.3d 1161, 1163 (Wyo. 2019) (quoting *L-MHB II*, ¶ 6, 431 P.3d at 564).

[¶54]  "Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong." *In re MAJB*, 2020 WY 157, ¶ 10, 478 P.3d 196, 200 (Wyo. 2020) (quoting *MH v. First Jud. Dist. Ct. of Laramie Cnty.*, 2020 WY 72, ¶ 5, 465 P.3d 405, 407 (Wyo. 2020)).  "If a court lacks subject matter jurisdiction, 'action taken by that court, other than dismissing the case, is considered to be null and void.'" *Id*.  Concerning the jurisdiction of juvenile courts, we have said:

> "Subject matter jurisdiction for juvenile courts originates in constitutional and statutory law." *In re MFB*, 860 P.2d 1140, 1146 (Wyo. 1993). The Wyoming Constitution authorizes the legislature to "provide for such juvenile delinquency and domestic relations courts as may be needed[.]" Wyo. Const. art. 5, § 29. Wyoming Statute 5-8-102 grants the juvenile court general jurisdiction over "[a]ny minor alleged to be neglected[.]" Wyo. Stat. Ann. § 5-8-102(a)(iii) (LexisNexis 2019). But,
>
>> Juvenile courts are courts of limited jurisdiction. Article 5, section 29 of the Wyoming Constitution delegates authority to the legislature to provide for juvenile delinquency courts that "shall have such jurisdiction as the legislature may by law provide." Thus, juvenile courts are the creation of the legislature and have powers only as expressly conferred by the legislature.
>
> *In re WJH*, 2001 WY 54, ¶ 30, 24 P.3d 1147, 1156 (Wyo. 2001) (citations omitted).

*BG*, ¶ 7, 451 P.3d at 1163.

[¶55] The Child Protection Act requires that the juvenile court insure the presence of the parents at any proceeding under the Act. It provides:

> (a) The court shall insure the presence at any hearing of the parents, guardian or custodian of any child subject to the proceedings under this act.
>
> (b) Any person served with an order to appear as provided in W.S. 14-3-414 and without reasonable cause fails to appear, is liable for contempt of court and the court may issue a bench warrant to cause the person to be brought before the court.
>
> (c) If the child, his parents, guardian or custodian or any other person willfully avoids or refuses service of order to appear, or it appears to the court that service of the order will be ineffectual or that the welfare of the child requires that he be brought immediately into the custody of the court, a bench warrant may be issued by the court for the child or his parents, guardian, custodian or any person having the actual physical custody or control of the child.

Wyo. Stat. Ann. § 14-3-415 (LexisNexis 2021).

[¶56] Although his appointed attorney appeared at the adjudication hearing, FR was not present. Despite his absence, the juvenile court proceeded with the hearing and adjudicated his children neglected based on evidence from the shelter care hearing. FR contends that in accordance with Section 415, the juvenile court was required to continue the hearing and issue a bench warrant to secure his presence, and that because it failed to do so, it lost jurisdiction to proceed to a permanency determination.

[¶57] This is the second time this Court has been asked to interpret the scope of a juvenile court's obligation under § 14-3-415(a) to "insure" a parent's presence at a hearing under the Child Protection Act. *See Interest of VS*, 2018 WY 119, ¶ 32, 429 P.3d 14, 23 (Wyo. 2018); *see also Interest of ECH*, 2018 WY 83, ¶ 44, 423 P.3d 295, 307-08 (Wyo. 2018) (interpreting meaning of "presence" as used in § 14-3-415(a)). In *VS*, we declined to answer the question because it had not been thoroughly briefed. *¶* 32, 429 P.3d at 23. In this case, we need not answer it, because even if the juvenile court were required to take certain steps to insure a parent's presence, that requirement is not jurisdictional.

[¶58] We have held that where a statute imposes no sanctions for failure to abide by its requirements, "it would require an unequivocal expression from the legislature for a violation of the statute's language to result in a lack of subject matter jurisdiction." *BG*, ¶ 10, 451 P.3d at 1164 (quoting *In re MFB*, 860 P.2d 1140, 1149 (Wyo. 1993)). For

example, in *BG*, we considered the Act's requirement that the juvenile court hold a review hearing six months before an adjudicated child's 18th birthday to determine whether services should continue beyond that point. ¶ 8, 451 P.3d at 1164. We concluded that the required review hearing and determination that services should be continued were jurisdictional because if the requirements were not timely completed, the Act "contains an 'unequivocal expression' that the juvenile court's orders with respect to a child adjudicated neglected terminate on the child's 18th birthday." *Id.* ¶ 10, 451 P.3d at 1164.

[¶59] In contrast, in *MFB*, we held that the juvenile court's failure to hold an adjudication hearing within the required timeframe did not result in a loss of jurisdiction. 860 P.2d at 1149. We explained:

> The language used by the legislature in Wyo. Stat. §§ 14-6-209(c) and 14-6-226(b) does not inhibit the juvenile court's subject matter jurisdiction. The legislature imposed no sanction for the failure of the juvenile court to set a time for a hearing within sixty days. We hold that it would require an unequivocal expression from the legislature for a violation of the statute's language to result in a lack of subject matter jurisdiction. *In re Kerr*, 481 A.2d [1225] at 1227 [(Pa. Super. 1984)]. We do not find such unequivocal language in Wyo. Stat. §§ 14-6-209(c) and 14-6-226(b).

*Id.*; *see also In re DSB*, 2008 WY 15, ¶¶ 19-20, 176 P.3d 633, 638 (Wyo. 2008) (holding that failure to adjudicate within 90-day statutory deadline did not deprive juvenile court of jurisdiction).

[¶60] Like the statutory adjudication deadlines at issue in *MFB* and *DSB*, Wyo. Stat. Ann. § 14-3-415(a) contains no sanctions for a juvenile court's failure to insure a parent's presence at a hearing. Nor does it contain an unequivocal expression that a violation of the requirement will result in a loss of the court's subject matter jurisdiction. We thus conclude that whatever the requirement to insure a parent's presence at a hearing may entail, the requirement is not jurisdictional. The failure of the juvenile court to insure FR's presence at the adjudication hearing thus did not deprive it of jurisdiction to proceed to a permanency determination.[7]

---

[7] FR intertwines his jurisdiction and due process arguments, but while a due process violation may void a judgment, it is an issue that is separate from subject matter jurisdiction. *See Carroll v. Gibson*, 2021 WY 59, ¶ 11, 485 P.3d 1004, 1007 (Wyo. 2021) (judgment is void "if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law") (quoting *Essex Holding, LLC v. Basic Properties, Inc.*, 2018 WY 111, ¶ 69, 427 P.3d 708, 728 (Wyo. 2018)); *see also United States v. Doe*, 698 F.3d 1284, 1289-90 (10th Cir. 2012) (due process claims do not implicate court's subject matter jurisdiction). Because subject matter jurisdiction and due process are separate considerations, we address FR's due process claims separately.

**B.      FR's Due Process Claim**

[¶61]   FR contends that the juvenile court violated his due process rights when it failed to insure his presence at the initial hearing, failed to advise him of his rights at the initial hearing, failed to insure his presence at the adjudication hearing, and adjudicated the children as neglected based on evidence submitted at the shelter care hearing.  The State responds that because FR did not timely appeal the adjudication order, this Court lacks jurisdiction to consider any claims arising out of the initial hearing or the adjudication hearing.

[¶62]   Because failure to file a timely notice of appeal deprives this Court of jurisdiction, we will first address the State's jurisdictional argument and then turn to any claims over which we have jurisdiction.  *See Golden v. Guion*, 2016 WY 54, ¶ 11, 375 P.3d 719, 722 (Wyo. 2016).  Whether this Court has jurisdiction is a question of law that we consider de novo.  *Davidson-Eaton v. Iversen*, 2021 WY 49, ¶ 9, 484 P.3d 23, 25 (Wyo. 2021) (citing *Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 28, 479 P.3d 1222, 1231 (Wyo. 2021)).

[¶63]   The Child Protection Act provides that "[a]ny party including the state may appeal any final order, judgment or decree of the juvenile court to the supreme court within the time and in the manner provided by the Wyoming Rules of Appellate Procedure."  Wyo. Stat. Ann. § 14-3-432(a) (LexisNexis 2021).  W.R.A.P. 2.01 requires that an appeal be taken by filing a notice of appeal within thirty days from entry of an appealable order.  An appealable order includes an "order affecting a substantial right made in a special proceeding."  W.R.A.P. 1.05(b).  "The timely filing of a notice of appeal is mandatory and jurisdictional."  *Interest of FP*, 2021 WY 77, ¶ 13, 488 P.3d 943, 947 (Wyo. 2021) (quoting *Golden*, ¶ 11, 375 P.3d at 722); *see also* W.R.A.P. 1.03.

[¶64]   "Proceedings in juvenile court are special proceedings."  *FP*, ¶ 14, 488 P.3d at 947 (quoting *DH v. Wyo. Dep't of Family Servs. (In re "H" Children)*, 2003 WY 155, ¶ 61, 79 P.3d 997, 1014 (Wyo. 2003)).  We have held that "adjudication and disposition orders affect a parent's substantial rights."  *Id*.  "Similarly, 'a parent's substantial rights are affected when the permanency plan is changed from reunification to termination and adoption.'"  *FP,* ¶ 14, 488 P.3d at 947 (quoting *KC v. State*, 2015 WY 73, ¶ 33, 351 P.3d 236, 245 (Wyo. 2015)).  We have further explained:

> Not all review hearings have the same impact on a parent's substantial rights. *At one end of the spectrum, a review hearing at which an ongoing permanency plan is reviewed and continued pending some required action by the parents will have relatively minor impact on the parties.* At the other end of the spectrum, a permanency hearing in which a court

24

changes the permanency plan from reunification to termination of parental rights has significant impacts, not only on parents, but on children as well.

*FP*, ¶ 16, 488 P.3d 947 (quoting *KC*, ¶ 34, 351 P.3d at 245) (emphasis in original).

[¶65]  At the initial hearing in this case, the juvenile court did no more than receive FR's denial of the allegations in the neglect petition and continue the custody, placement, and permanency plan it directed at the shelter care hearing.  The order on initial hearing therefore did not affect FR's substantial rights, and it was not an appealable order.  The State acknowledges this, but it nonetheless contends that FR's failure to timely appeal the adjudication order means this Court is without jurisdiction to consider any claim arising out of the initial hearing.  We disagree.

[¶66]  Orders in juvenile court proceedings that are not immediately appealable "are reviewable in an appeal from a final, appealable order."  *FP*, ¶ 17, 488 P.3d at 947.  We have explained:

> Because the juvenile court's interlocutory findings concerning DFS's investigation and reasonable efforts did not affect Mother's substantial rights, they are not "appealable order[s]" under W.R.A.P. 1.05. However, that simply means Mother did not need to appeal from them within 30 days of their issuance under W.R.A.P. 2.01 (requiring notice of appeal to be filed "within 30 days from entry of the *appealable* order") (emphasis added). Indeed, had Mother immediately appealed, we would have dismissed for want of an appealable order. The fact these interlocutory findings were not immediately appealable does not mean they are never reviewable. They are reviewable in an appeal from a final, appealable order. *Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 11, 180 P.3d 895, 899 (Wyo. 2008) ("Generally, interlocutory orders merge into the final order .... '[A] notice of appeal that names the final judgment is sufficient to support review of all earlier orders that merge in the final judgment under the general rule that appeal from a final judgment supports review of all earlier interlocutory orders.'" (citing *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 820 (Wyo. 1994), and quoting 16A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3949.4, at 72 (1999)); *Geerts v. Jacobsen*, 2004 WY 148, ¶ 13, 100 P.3d 1265, 1269 (Wyo. 2004) ("The general rule is that all provisional or interlocutory proceedings in a matter are merged in, and disposed of, by the final

25

decree.") (citing *Hinrichs v. Office of Family & Children of Allen Cnty.*, 798 N.E.2d 867, 872 (Ind. App. 2003)).

*FR*, ¶ 17, 488 P.3d at 947-48; *see also ECH*, ¶ 20, 423 P.3d at 301-02 (on appeal from permanency order, addressing claim that juvenile court erred in initial hearing by failing to advise appellant of his right to an attorney and by failing to appoint attorney).

[¶67] Because the order on initial hearing was not an appealable order, FR's claims relating to the initial hearing are reviewable in his appeal from the permanency order. We therefore have jurisdiction to consider those claims.

[¶68] As to the order adjudicating the children neglected, our precedent is clear that an adjudication order is a final appealable order. *FP*, ¶ 14, 488 P.3d at 947 (citing *"H" Children*, ¶ 61, 79 P.3d at 1014); *see also Matter of AM-LR*, 2018 WY 76, ¶ 10, 421 P.3d 551, 554 (Wyo. 2018) ("An order from which an appeal lies constitutes a 'judgment' as used in the Wyoming Rules of Civil Procedure.") (citing W.R.C.P. 54(a); *In Interest of NP*, 2017 WY 18, ¶ 15 n.1, 389 P.3d 787, 791 n.1 (Wyo. 2017)). FR does not dispute the appealability of the adjudication order, or his failure to appeal the order, but he contends that the order is subject to collateral attack because it was entered in violation of his due process rights. To the extent FR's claims of error assert a due process violation, we agree that we may consider them.

[¶69] "Collateral attack principles apply where a party is seeking to attack or 'undo' a prior court order" by means other than a direct appeal. *Joyner v. State*, 2002 WY 174, ¶¶ 14, 16, 58 P.3d 331, 336, 337 (Wyo. 2002); *see also Matter of Adoption of SSO*, 2017 WY 142, ¶ 9, 406 P.3d 723, 726 (Wyo. 2017). Collateral attacks on judgments are generally not allowed, but a void judgment is subject to collateral attack. *SSO*, ¶ 9, 406 P.3d at 726. A judgment entered in violation of due process is void and therefore subject to collateral attack. *Joyner*, ¶ 16, 58 P.3d at 337; *see also Carroll*, ¶ 11, 485 P.3d at 1007 ("A judgment 'is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.'") (quoting *Essex*, ¶ 69, 427 P.3d at 728).

[¶70] With respect to the adjudication of neglect, FR contends that the juvenile court violated his due process rights when it proceeded with the hearing in his absence and when it took judicial notice of the evidence from the shelter care hearing. FR's first claim asserts a lack of notice and opportunity to be heard and is therefore a due process claim that we may consider through his collateral attack. *See Interest of AA*, 2021 WY 18, ¶ 15, 479 P.3d 1252, 1257 (Wyo. 2021) ("Procedural due process requires the government to provide a parent with reasonable notice and a meaningful opportunity to be heard before interfering with his fundamental right to familial association.") (citing *DSB*, ¶ 27, 176 P.3d at 639).

[¶71]  FR's second claim asserts an error in the admission of the shelter care evidence, but he cites no authority and provides no analysis as to how this alleged evidentiary error is jurisdictional or amounts to a denial of due process.  *See Jontra Holdings,* ¶ 58, 479 P.3d at 1239 (rulings on admissibility of evidence reviewed for abuse of discretion); *see also Matter of TJH*, 2021 WY 56, ¶ 13, 485 P.3d 408, 413 (Wyo. 2021) ("We need not consider issues which are not supported by proper citation of authority and cogent argument or which are not clearly defined.") (quoting *Willey v. Willey*, 2016 WY 116, ¶ 30, 385 P.3d 290, 299-300 (Wyo. 2016)).  Because FR has offered no cogent argument as to how the alleged error in the admission of the shelter care evidence violated his due process rights, the error is not one that we may consider through a collateral attack.  11 Wright & Miller, *Fed. Prac. & Proc. Civ*. § 2862 (3d ed. April 2021 update) ("A judgment is not void merely because it is erroneous. It is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.") (footnotes omitted); *see also Carroll*, ¶ 11, 485 P.3d at 1007.

[¶72]  Given that the adjudication order is not subject to collateral attack based on the claimed evidentiary error and FR did not timely appeal the order, we do not have jurisdiction to consider his claim that the juvenile court erred in admitting the shelter care evidence to adjudicate the children's neglect.  *See FP*, ¶¶ 13-14, 488 P.3d at 947 (timely appeal from adjudication order is jurisdictional).  We turn then to the claims that we have jurisdiction to consider.  We will first address the claims of error in the initial hearing, followed by the alleged due process violation in the adjudication hearing.

1.    **Initial Hearing**

[¶73]  As noted earlier, the juvenile court held the initial hearing without FR present although he was available by telephone.  It therefore could not advise FR of the charges against him and of his rights, and it had not done so during his first appearance in the shelter care hearing.  FR contends these failings violated his right to due process.

[¶74]  FR's attorney did not object to the manner in which the juvenile court conducted the initial hearing, and FR did not assert a due process violation below.  "Normally, we will not consider an issue raised for the first time on appeal, but we have recognized two exceptions to this rule: when the issue raises jurisdictional questions or when the issue is of such a fundamental nature that it must be considered."  *AA*, ¶ 10, 479 P.3d at 1256 (quoting *ECH*, ¶ 21, 423 P.3d at 302).

[¶75]  "The right of familial association is fundamental."  *AA*, ¶ 11, 479 P.3d at 1256 (citing *In re GGMC*, 2020 WY 50, ¶ 22, 460 P.3d 1138, 1145 (Wyo. 2020)).  Additionally, we have observed:

> Given the close connection between procedures required in the
> early stages of a child protection action and the cessation of

> reunification efforts, the issue of whether the juvenile court violated [a parent's] due process right is of a fundamental nature.

*AA*, ¶ 13, 479 P.3d at 1257.

[¶76]   Given the fundamental nature of FR's due process claim, we will consider it even though it was not raised below.  Because, however, FR did not raise this issue before the juvenile court, our review is limited to a search for plain error.  *AA*, ¶ 14, 479 P.3d at 1257 (citing W.R.A.P. 9.05); *see also ECH*, ¶ 21, 423 P.3d at 302.

> Plain error occurs when "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." The appellant bears the burden of proving plain error.

*AA*, ¶ 14, 479 P.3d at 1257 (quoting *ST v. State (In re DT)*, 2017 WY 36, ¶ 23, 391 P.3d 1136, 1143 (Wyo. 2017)).[8]

[¶77]   The first element of the plain error test is met because the record is clear that the juvenile court did not permit FR to participate in the initial hearing by telephone and it did not advise him of his rights.  As to the second element, we need not reach FR's due process claim because the record is clear that the juvenile court violated its statutory obligations to insure that FR was present for the initial hearing and to advise him of his rights.  *See ECH*, ¶ 20, 423 P.3d at 302 (finding juvenile court violated appellant's statutory rights and therefore declining to address due process claim); *see also Wilson v. Bd. of Cnty. Comm'rs of Cnty. of Teton*, 2007 WY 42, ¶ 14, 153 P.3d 917, 922 (Wyo. 2007) (Court will not address constitutional issues if it is able to resolve the case on other grounds).

[¶78]   The juvenile court had a clear statutory obligation to insure FR's presence at the initial hearing.  Wyo. Stat. Ann. § 14-3-415(a) ("The court shall insure the presence at any hearing of the parents, guardian or custodian of any child subject to the proceedings under this act.").  Under the circumstances, we need not interpret the statute to determine the scope of this obligation and the steps that a juvenile court may be required to take to satisfy it.  Here, FR asked to participate by telephone, and the court could have satisfied its statutory obligation by simply allowing FR to call in.  Because the record provides no justification for declining FR's request, we find that the court violated its clear and unequivocal obligation to insure FR's presence at the initial hearing.

---

[8] FR does not offer a plain error analysis on appeal, but his argument generally follows that framework. Considering the fundamental nature of FR's claim, we will not deem the plain error argument waived. *See Rodriguez v. State*, 2019 WY 25, ¶ 38, 435 P.3d 399, 411 (Wyo. 2019) (declining to review for plain error where no plain error analysis provided).

[¶79]   The juvenile court likewise had a clear statutory obligation to advise FR at the initial hearing of the allegations against him and of his rights.  Wyo. Stat. Ann. § 14-3-426(a) ("At the initial hearing, the child and his parents, guardian or custodian shall be advised by the court of their rights under law and as provided in this act.  They shall also be advised of the specific allegations in the petition and given an opportunity to admit or deny them.  They shall also be advised of the possible liability for costs of treatment or services pursuant to this act.").  The court did not so advise FR despite his availability to participate by phone, and it therefore violated a clear and unequivocal rule of law.  *See ECH*, ¶ 29, 423 P.3d at 304 (juvenile court transgressed a clear and unequivocal rule of law when it failed to advise parent of his right to counsel at first appearance).

[¶80]   The final element of the plain error test requires that FR show that he was materially prejudiced by the juvenile court's statutory violations.  "To establish material prejudice, there must be a reasonable possibility that, 'absent the error, the appellant may have enjoyed a more favorable outcome.'"  *AA*, ¶ 26, 479 P.3d at 1260 (quoting *ECH*, ¶ 33, 423 P.3d at 305).

[¶81]   FR asserts that he was prejudiced by his absence from the initial hearing and the juvenile court's failure to advise him of his rights because: 1) he was not advised of his rights to confront and cross-examine witnesses, present evidence, and compel witnesses and "would seemingly forego those rights by failing to appear at his Adjudication;" 2) his absence deprived him of the opportunity to enter a consent decree, which would have given him a significant advantage in the case; and 3) he did not understand his right to appeal the adjudication order.  We find no material prejudice.

[¶82]   As to his understanding of his rights to confront and cross-examine witnesses and present evidence at the adjudication hearing, and his right to compel witnesses for the hearing, the record contains no evidence that the parties anticipated an evidentiary hearing.  The record instead shows that the parties were negotiating a consent decree, as alluded to in FR's additional claim of prejudice.  It stands to reason then that his decision to forego attending the adjudication would not have changed had he known of his opportunity to confront and cross-examine witnesses, present evidence, and compel witnesses.  Additionally, FR's attorney made no offer of proof as to any evidence FR might have presented if the juvenile court had allowed the parties to present evidence, and FR has not shown on appeal how the outcome of the neglect adjudication would have differed had he had the opportunity to present evidence and confront the State's evidence.[9]

---

[9] If a party does not make an offer of proof as to evidence it asserts it would have offered, "we have no way to gauge its admissibility or any prejudice that may have resulted from its exclusion."  *Van Fleet v. Guyette*, 2020 WY 78, ¶ 29, 466 P.3d 812, 821 (Wyo. 2020); *see also Matter of LDB*, 2019 WY 127, ¶ 48, 454 P.3d 908, 922 (Wyo. 2019)).

[¶83]   We also reject FR's claim that he was prejudiced by the lost opportunity to negotiate a consent decree.  A consent decree in a neglect proceeding must include a case plan and provide for placement of the child(ren), which may be in the home or outside the home, and the decree may or may not include an admission to the allegations in the neglect petition.  Wyo. Stat. Ann. § 14-3-428 (LexisNexis 2021).[10]  Because the record does not contain the proposed consent decree or any indication of its terms, it is impossible to determine whether it would have changed the outcome of the adjudication or subsequent proceedings.

---

[10] Wyo. Stat. Ann. § 14-3-428 reads:

> (a) At any time after the filing of a petition alleging a child to be neglected and before adjudication, the court may issue a consent decree ordering further proceedings held in abeyance. The placement of the child is subject to the terms, conditions and stipulations agreed to by the parties affected in accordance with W.S. 14-3-429. The consent decree shall not be entered without the consent of the district attorney, the child's guardian ad litem and the parents. Modifications to an existing consent decree may be allowed.

> (b) The consent decree shall be in writing and copies given to all parties. The decree shall include the case plan for the family.

> (c) A consent decree, if the child remains within the home, shall be in force for the period agreed upon by the parties unless sooner terminated by the court.

> (d) If the child is placed outside the home, a consent decree shall be in force for the period agreed upon by the parties but not longer than six (6) months unless sooner terminated by the court. For good cause the court may grant one (1) extension of the consent decree for no longer than six (6) months.

> (e) If a consent decree is in effect and the child is in placement, the court shall hold review hearings as provided by W.S. 14-3-431.

> (f) If prior to discharge by the court or expiration of the consent decree, the parents or guardian of a child alleged to be neglected fail to fulfill the terms and conditions of the decree or a new petition is filed alleging the child to be neglected, the original petition and proceeding may be reinstated upon order of the court after hearing, and the court may proceed as though the consent decree had never been entered. If, as part of the consent decree, the parents or guardian made an admission to any of the allegations contained in the original petition, that admission shall be entered only if the court orders that the original petition and proceeding be reinstated and the admissions, if any, be entered. If the admission is entered, the court may proceed to disposition pursuant to W.S. 14-3-426.

[¶84]   Additionally, while we do not know the proposed terms of the contemplated consent decree, we do know it would have included a case plan.  Wyo. Stat. Ann. § 14-3-428(b).  Presumably that case plan would have had the same focus of ensuring that FR could maintain a safe and stable home for the children.  FR fails to show how or why he would have made greater progress under that plan than he did under the plan he was required to work after the adjudication.  FR has thus failed to show that he was materially prejudiced by his lost opportunity to pursue a consent decree.

[¶85]   We likewise reject FR's claim that he was prejudiced by the juvenile court's failure to advise him of his rights at the initial hearing because he did not understand his right to appeal the adjudication order.  The court was required to advise FR of his right to appeal any final order, judgment, or decree to the Wyoming Supreme Court.  *See* Wyo. Stat. Ann. §§ 14-3-409(b)(v); 14-3-426(a); 14-3-432(a).  At a December 18, 2019 MDT meeting, it was reported that FR stated he "wanted to put in an appeal in June 2019, but he never heard back and felt it was too late."  The plain import of this statement is that he knew of his right to appeal, though he may not have known the particulars of how and when to appeal.  Those particulars, however, are the reason that FR had an appointed attorney, and he has made no allegation that he was unable to communicate with his attorney or that his attorney provided ineffective assistance.  *Powell v. State of Ala.*, 287 U.S. 45, 68-69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932) (noting the importance of appointed counsel in guiding a layman through the legal process); *see also Smith v. O'Grady*, 312 U.S. 329, 333-34, 61 S.Ct. 572, 573-74 85 L.Ed.859 (1941).  Under these circumstances, where FR knew of his right to appeal and had appointed counsel whose advice he could seek concerning that right, we find that FR has failed to establish that the juvenile court's failure to advise him of his rights at the initial hearing materially prejudiced him.

[¶86]   We are troubled that the juvenile court did not have FR participate in the initial hearing, that it at no point advised FR of the allegations against him and of his rights,[11] and that it entered an order on initial hearing that indicated otherwise.  Nonetheless, FR has failed to show that he was materially prejudiced by these errors, and we therefore find no plain error.[12]

---

[11] The court could have, and should have, advised FR of the allegations against him and his rights at the shelter care hearing, but FR did not appeal the shelter care order or raise this as an issue.  Wyo. Stat. Ann. § 14-3-409(b).

[12] As a final note on this issue, we reject the State's suggestion that we should consider the fact that this was not FR's "first foray through the juvenile court system," and that he "had knowledge and experience with the system."  The Child Protection Act mandates a process that must be followed each time a neglect or abuse petition is filed, and it contains no exceptions for repeat participants.  We emphasize that we are able to find that FR understood his right to appeal based on a statement he made on the record.  We will not presume that a party understands his or her rights based on a prior petition, particularly where, as is the case here, the records of the prior petition are not included in the record before us.

## 2.    **Adjudication Hearing**

[¶87]  FR contends that the juvenile court violated his due process rights by proceeding with the adjudication hearing in his absence.  Because this claim is before us on a collateral attack, we do not have jurisdiction to consider whether the court's actions violated a statutory mandate and instead may consider only the due process question.

[¶88]  The question of whether an individual was afforded constitutional due process is one of law, which, when properly preserved, we review de novo.  *Matter of NRAE*, 2020 WY 121, ¶ 12, 472 P.3d 374, 377 (Wyo. 2020) (citing *Booth v. Booth*, 2019 WY 5, ¶ 11, 432 P.3d 902, 907 (Wyo. 2019)).

> The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness.

*NRAE*, ¶ 12, 472 P.3d at 377 (quoting *In re MC*, 2013 WY 43, ¶ 29, 299 P.3d 75, 81 (Wyo. 2013)).

[¶89]  We have not determined the standard of review that should apply when a party asserts a collateral attack on a judgment based on an alleged due process violation—that is, whether it should be de novo as mentioned above, plain error, or some other standard. *See*, *e.g.*, *Cutbirth v. State*, 751 P.2d 1257, 1266 n.4 (Wyo. 1988) (applying a plain error standard of review to a defendant's collateral attack on his conviction based on ineffectiveness of counsel and noting that the United States Supreme Court applies a more stringent standard); *see also SSO*, ¶¶ 8-9, 406 P.3d at 726-27 (whether jurisdictional defect provides basis for collateral attack is a question of law reviewed de novo and defect must appear on face of record).  We need not resolve this question, however, because we conclude that FR waived his claim.

[¶90]  A due process claim may be waived.  *Interest of L-MHB (L-MHB I)*, 2017 WY 110, ¶ 32, 401 P.3d 949, 959 (Wyo. 2017) (quoting *Verheydt v. Verheydt*, 2013 WY 25, ¶ 24, 295 P.3d 1245, 1251 (Wyo. 2013)).  If it is waived, appellate review is not available.  *L-MHB I*, ¶ 33, 401 P.3d at 960 (quoting *Toth v. State*, 2015 WY 86A, ¶ 45, 353 P.3d 696, 710 (Wyo. 2015)).  Likewise, it is not subject to collateral attack.  *L.C. Jones Trucking Co. v. Superior Oil Co.*, 68 Wyo. 384, 431-32, 234 P.2d 802, 820 (1951) (judgment not subject to collateral attack because non-jurisdictional defects were waived in original proceeding).

[¶91]  Because due process merely affords the opportunity to be heard, "a party can waive his due process right to be heard by voluntarily absenting himself from the proceedings."

*Peak v. Peak*, 2016 WY 109, ¶ 10, 383 P.3d 1084, 1088 (Wyo. 2016) (emphasis omitted) (quoting *Jones v. Jones*, 903 P.2d 545, 548 (Wyo. 1995)).  We have also said:

> A waiver occurs when there is an intentional relinquishment of a known right manifested in an unequivocal manner. *Cathcart v. Meyer*, 2004 WY 49, ¶ 21, 88 P.3d 1050, 1060 (Wyo. 2004); *Jensen v. Fremont Motors Cody, Inc.*, 2002 WY 173, ¶ 16, 58 P.3d 322, 327 (Wyo. 2002). While the intent to waive may be implied from conduct, the conduct should speak the intent clearly. *Id*. Silence or delay in asserting a right without more does not constitute the unequivocal manifestation of intent required for a claim of waiver. *Jensen*, ¶ 20, 58 P.3d at 327-28. To support a claim of waiver there must be an obligation to speak or the silence or inaction must be of such duration that i[t] shows an intent to yield a known right. *Id*.

*L-MHB I*, ¶ 32, 401 P.3d at 959-60 (quoting *Verheydt*, ¶ 24, 295 P.3d at 1251).

[¶92]  We have held that the type of conduct, silence, or delay that clearly communicates an intent to waive a claim includes a failure to object and the active participation in a proceeding.  *In re Guardianship of Sands*, 2013 WY 60, ¶ 35, 301 P.3d 128, 136 (Wyo. 2013); *Verheydt*, ¶ 30, 295 P.3d at 1253; *Wyo. Worker's Safety & Comp. Div. v. Wright*, 983 P.2d 1227, 1231 (Wyo. 1999), *overruled on other grounds*, *Torres v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2004 WY 92, 95 P.3d 794 (Wyo. 2004). "[W]e will not condone the practice of actively and willingly participating in the proceeding, only to appeal the process when an adverse ruling is the result."  *Verheydt*, ¶ 30, 295 P.3d at 1253 (citing *Wright*, 983 P.2d at 1233).

[¶93]  For example, in *Sands*, the appellant claimed that the district court erred in ruling on his allegations of guardian misconduct because the only issue noticed for hearing was the guardian's application for fees and costs.  ¶ 31, 301 P.3d at 135.  We concluded that the appellant had waived his claim.

> At no time during the hearing did Mr. Sands' counsel object to the proceedings. To the contrary, he voluntarily participated in the proceedings when, in response to the court's statement that somebody had to address the misconduct issue and maybe it should be the party alleging it, counsel stated he "would be glad to go first" and proceeded to make an opening statement and call and examine witnesses to testify in an effort to prove Mr. Brown's misconduct. Even when the district court stated that it intended to enter judgment and informed counsel that he had been "completely heard," no objection was made. Likewise,

when the district court made its ruling, counsel did not object. We hold that any claim of error in the proceedings was waived by counsel's unequivocal manifestation of intent to participate and failure to object.

*Sands*, ¶ 35, 301 P.3d at 136.

[¶94] Law enforcement made two attempts to serve FR with notice of the adjudication hearing, but neither was successful. Nonetheless, the attorney who represented FR in the adjudication hearing represented to the juvenile court that FR knew of the hearing. FR subsequently denied that he knew of the hearing, first in an email to a DFS caseworker and then in his testimony during the permanency hearing. Prior to the permanency hearing, however, which was held nearly a year after the adjudication, and several hearings after the adjudication, FR never informed the court that he did not attend the adjudication because he did not know when it would be. Indeed, even at the permanency hearing, he did not testify that he was concerned that the hearing had been held in his absence.[13]

---

[13] FR argues that the billing statements of his attorney support his claim that he was not told of the date and time for the adjudication hearing because they contain no contemporaneous entries of a conversation with him or email to him. We are not inclined to read much into the billing statements because there may be an explanation for the absence of such an entry. On their own, the statements tell us very little.

We do note that the record concerning FR's notice of the hearing date and time would have been more clear if FR's attorney, of her own volition or at the behest of the court, had been specific as to how FR was notified of the hearing. For example, in one case, the following occurred, which made it clear that counsel had spoken to the father who failed to appear for a permanency hearing:

> The juvenile court held a permanency hearing on November 17, 2017. Mother did not appear, but agreed to relinquish her parental rights. Father had been released from prison, and the juvenile court granted him permission to attend the hearing by telephone from Alabama. He did not, however, answer when the court called him. His attorney attended the hearing in person, and the juvenile court asked her whether Father had notice of the hearing, to which she responded:
>
> > He did, Your Honor.
> >
> > It was my understanding that he would be ready to answer the phone call. I also explained to him that while it is set for 9 o'clock, these are stacked settings, so it may be 10 o'clock or 11 o'clock his time by the time he receives a call. So I have no explanation for his absence or his not answering the telephone.

*VS*, ¶ 19, 429 P.3d at 20.

That it was not FR's appointed counsel who represented FR in the adjudication hearing, but instead someone filling in for her, may have contributed to the lack of clarity. In the GAL's brief on appeal in support of the State, the GAL asserts (emphasis in original), "*While it is not a basis for remand, it is a*

34

[¶95] In addition to the indication that FR knew of the adjudication hearing and voluntarily did not attend, we have the acquiescence of his attorney in how the juvenile court proceeded with the adjudication hearing. FR's attorney did not object or request a continuance even when the court invited her to add anything she felt needed to be on the record. There is also FR's acquiescence. After the adjudication and before the permanency hearing, he participated in numerous MDT meetings and four hearings before the court, including a review hearing where his appointed attorney commented:

> [FR] is doing really, really well. He is working really hard. I think this has been a bit of a blessing and a curse, but this has allowed him an opportunity to utilize those resources, have a bit of a break from the children, which can be overwhelming, to utilize his resources and sort of get back on track and get to where they can have stability long term. Things are going well.

[¶96] FR has made no claim that his attorney was ineffective or that she misrepresented his views. Under these circumstances, where there is evidence that FR knew of the hearing, and where his attorney acquiesced in the procedure and later represented that the neglect proceedings had benefitted FR, we are satisfied that FR waived any due process claim he may have had based on the juvenile court's holding of the adjudication hearing in his absence.

## C.     Reasonable Efforts to Reunify Family

[¶97] To order a change in permanency from family reunification to adoption, a juvenile court must find that DFS made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest. *Interest of SW*, 2021 WY 81, ¶ 17, ___ P.3d ___, ___ (Wyo. 2021) (citing *KC,* ¶ 25, 351 P.3d at 243). FR does not challenge the juvenile court's best interest determination, but he contends that the court erred in finding that DFS made reasonable efforts to achieve reunification.

[¶98] "We review such decisions under the abuse of discretion standard, which looks to the reasonableness of the court's determination and whether it was supported by a preponderance of the evidence." *Interest of JW*, 2018 WY 22, ¶ 20, 411 P.3d 422, 426 (Wyo. 2018) (citing *KC*, ¶ 18, 351 P.3d at 242).

> In analyzing the sufficiency of [the] evidence, we defer to the juvenile court's judgment, examining all evidence in the light

---

*disconcerting habit of parents' counsel to allow non-parents attorneys to appear in their stead when not available.*" FR did not raise this as an issue, but we agree with the GAL and caution appointed counsel to proceed with care when relying on substitute counsel.

most favorable to the State and resolving all evidentiary conflicts in its favor. We assume all of its evidence is true and disregard any contrary proof adduced by the parent challenging the juvenile court's decision.

*VS*, ¶ 38, 429 P.3d at 25 (quoting *JW*, ¶ 20, 411 P.3d at 426).

[¶99] "DFS has a statutory responsibility to make reasonable efforts to reunify children with their parents." *JW*, ¶ 21, 411 P.3d at 426; *see also* Wyo. Stat. Ann. § 14-3-440 (LexisNexis 2021). Any court determination of reasonable efforts must consider whether services to the family have been "accessible, available and appropriate." Wyo. Stat. Ann. § 14-3-440(e). We have also observed, however,

that there is a limit to what courts can require in the absence of parental cooperation. Without that cooperation, continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point. A parent's failure to take advantage of available services, or to meaningfully participate in a case plan developed by DFS with his input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful.

*JW*, ¶ 21, 411 P.3d at 426 (citing *SD v. Carbon Cnty. Dep't of Family Servs.*, 2002 WY 168, ¶ 23, 57 P.3d 1235, 1241 (Wyo. 2002)) (footnote omitted).

[¶100] FR requested that the juvenile court order DFS to obtain a parental capacity evaluation for him before changing permanency, and the court denied that request.[14] On appeal, he contends that in the absence of that parental capacity evaluation, the court abused its discretion in finding that DFS had made reasonable efforts to achieve reunification. We disagree.

[¶101] A parental capacity evaluation is not required by statute, rule, or regulation, and the record contains no evidence that DFS considers it essential to achieving reunification. Caseworker Britteny Thaler testified:

---

[14] FR's attorney first requested that DFS be ordered to obtain a parental capacity evaluation for FR during the twelve-month review and permanency hearing held on March 19, 2020. The court indicated it would need a written motion to order the evaluation but also indicated that it was unlikely to order it before the evidentiary hearing on permanency and that it may become a moot point if the court were to order a change in permanency. FR's attorney did not file a motion but renewed her request for the evaluation during the evidentiary permanency hearing held on May 27. Under the circumstances, we understand why counsel held off on filing a motion for the evaluation, and we consider FR's claim preserved for appeal.

Q. And then when [FR] sort of regresses in his working with the case plan, is there anything particular you can point to that occurred in his life that leads to that or are you unable to point to any specific thing or things?

A. I'm unable to point. I wish I knew.

Q. Sure. In that vein, at our recent multidisciplinary team meeting you mentioned that there's a piece of the puzzle missing?

A. Yes.

Q. Are there certain tools that haven't been utilized in this case that could assist the department and the rest of the team in perhaps identifying that piece of the puzzle?

A. Sure. So there is a parental capacity evaluation that potentially could lead us to identifying additional ways to engage [FR] in services, but ultimately he would have to be willing and able to accept those services in order for it to be successful.

[¶102] The purpose of the parental capacity evaluation then is to identify services that may assist a parent in case plan compliance and reunification. The evidence was abundant, however, that FR refused most services, which would likely have made the evaluation a futile step. For example, Ms. Thaler testified:

Q. Is it fair to say you offered a lot of services?

A. Yes, more than I've done on any other case.

Q. And how many months has the case been open?

A. This current case has been opened since April of 2019, so 14 months, I believe.

Q. Do you think there are any more services that you could offer [FR] to help him be successful?

A. I think I can continue to offer several services but unless [FR] will accept them and make changes, no, they would not be successful.

37

Q.      You mentioned unless [FR] is willing to accept them, has that always been a challenge throughout this case?

A.      Yes, very much so.

Q.      Can you explain how that's been a challenge?

A.      In almost every single service that we have offered or help that we have tried to do, whether it is DFS or CASA or LifeNet, [FR] is resistant towards it, feeling there's an ulterior motive to the services and that everybody is out to get him.

[¶103] The LifeNet representative testified to similar experiences with FR. Likewise, William Pogue, one of the children's counselors, testified:

Q.      At one point, I believe it was not the last MDT, but the MDT prior to that, you were advocating, reading from the paper, I wasn't there, that you were advocating for getting [FR] and [RR(B)] together for therapy. Do you think that would help you have a better understanding of maybe where [FR] struggles and how you could maybe recommend some services that might be beneficial to preserve a bond between [FR] and [RR(B)]?

A.      I think the biggest issue for me is not the actual recommendation of the services. It's the fact that I don't believe the services, from what I have seen and the experiences that we've had, won't actually be utilized. So I feel like I've thrown out a lot of the things to Brittney and other team members about services that ideally I would like to see potentially enacted with [FR], but the problem is there's no forward progress when we do offer those services. He doesn't take advantage of them or he becomes defensive about them to the point where I could throw a lot of different things at him and do a lot of different things with him that I feel like would have been mutually beneficial, but again there's that blockade between what he will engage in and what he won't. I haven't seen him want to engage in anything.

[¶104] Throughout the life of this case, DFS provided FR numerous services, including substance abuse evaluation and drug testing, transportation services, assistance with housing and food stamps, and assistance with supervised and unsupervised visits. It also

38

contracted with LifeNet to provide FR services. The support LifeNet offered included: transportation; visit supervision; house cleaning assistance; drop-in visits; assistance with physical and emotional well-being; development of a written safety plan; job search assistance; assistance in applying for benefit programs; assistance in creating a chore chart; assistance in purchasing a birth certificate; the purchase of hygiene and household items for FR and the children; and obtaining donated bunk beds, clothing, and other household items. CASA bought FR a vehicle, provided a queen size bed and nightstand, purchased groceries for him, and obtained donated clothing.

[¶105] Given the level of assistance offered, FR's resistance to services, and the limited progress made toward reunification, the juvenile court's denial of the request for a parental capacity evaluation was reasonable. The evaluation would have delayed permanency for the children, and based on FR's history, it was unlikely to produce a different outcome. We have observed:

> The plain language of § 14-3-440 requires DFS to make reasonable efforts to reunify the family. Nevertheless, the statute also recognizes that the children's health and safety is paramount, timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued.

*In re NDP*, 2009 WY 73, ¶ 21, 208 P.3d 614, 619 (Wyo. 2009).

[¶106] Under these circumstances, the juvenile court properly recognized that the children's right to stability and permanency outweighed FR's interest in reunification. *See VS*, ¶ 53, 429 P.3d at 28. We therefore find no abuse of discretion in its determination that DFS made reasonable efforts at reunification without success and to change the permanency plan from reunification to adoption.

## D.  Cumulative Error

[¶107] FR last contends that even if the errors in this case were individually harmless, they were prejudicial in the aggregate. He thus contends that the permanency order must be reversed for cumulative error.

> "The purpose of evaluating for cumulative error is 'to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.'" *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008) (citations omitted). Only those matters that are considered error are

39

evaluated under our cumulative error analysis. *Id*. "We will reverse . . . only when 'the accumulated effect of the errors constitutes prejudice and the conduct of the trial is other than fair and impartial.'" *Id*. (citations omitted).

*In re AGS*, 2014 WY 143, ¶ 32, 337 P.3d 470, 480 (Wyo. 2014); *see also Hicks v. State*, 2021 WY 2, ¶ 40, 478 P.3d 652, 663 (Wyo. 2021) ("When performing a cumulative error analysis, 'we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous.'") (quoting *Sweet v. State*, 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010)).

[¶108] Although we have found that the juvenile court violated a clear and unequivocal rule of law when it denied FR the opportunity to participate by phone in the initial hearing and failed to advise him of his rights, we found no material prejudice and therefore no plain error. We have also rejected FR's other claims of error. Because we have found no error, FR's cumulative error claim fails.[15]

[¶109] Affirmed.

---

[15] FR asks us to consider all of his claims under a harmless error analysis for purposes of our cumulative error analysis, regardless of whether the claim was preserved below. We have recognized, however, that there is no distinction between plain error or harmless error in conducting a cumulative error analysis. *Bogard v. State*, 2019 WY 96, ¶ 71, 449 P.3d 315, 332 (Wyo. 2019) (quoting *Sam v. State*, 2017 WY 98, ¶ 65, 401 P.3d 834, 856 (Wyo. 2017)). Regardless of whether the claimed errors are evaluated under a plain error or harmless error analysis, the question is whether combined they affected a party's substantial rights such that a reasonable possibility exists that the outcome would have been different had the errors not occurred. *Id*. As we concluded in our plain error analysis, FR has not made that showing.