# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 22

OCTOBER TERM, A.D. 2021

February 4, 2022

JESSE LACKEY,

Appellant
(Plaintiff),

v.

S-21-0160

SHAWNA LACKEY,

Appellee
(Defendant).

*Appeal from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
    Benjamin J. Sherman of Olsen Legal Group, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
    No appearance.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]   Jesse Lackey (Father) appeals the district court's order denying his petition to modify child custody.   Father contends the court abused its discretion when it found a material change in circumstances had occurred that warranted reconsideration of child custody but then declined to modify the custody arrangement, and when it excluded the testimony of one of his witnesses at trial.   Mother did not file a brief.   We affirm.

## *ISSUES*

[¶2]   We rephrase Father's issues:

> I.   Did the district court abuse its discretion when it declined to modify the custody arrangement?
>
> II.   Did the district court abuse its discretion when it excluded the testimony of Father's witness at trial?

## *FACTS*

[¶3]   Father and Shawna Lackey (Mother) married in 2011 and had one child, SL, in 2013.[1]   Father and Mother divorced in 2017.   In the stipulated divorce decree, they agreed to joint physical and legal custody of SL and set a schedule by which they exchanged custody every Thursday and Sunday.   In terms of child support, the decree calculated that Mother owed Father a presumptive amount of $138.34 per month but deviated it to $0 "based on the agreement of the parties, the shared custody arrangement, and the best interests of the child."

[¶4]   Relevant to this appeal, the decree also provided that Father shall pay all of SL's daycare expenses up to $600 per month, and that the parties must agree to any change in a daycare provider.   Father and Mother each had to provide health insurance for SL and they were to alternate years for which they could claim SL on their taxes.   The parties were also required to "consult with each other regarding decisions which affect the health and general welfare of [SL]."   This included decisions concerning SL's health care, education, and extracurricular activities.[2]

[¶5]   Shortly after the court issued the decree, Father and Mother agreed to switch their custody schedule to a week on, week off rotation.   By all accounts, the parties maintained

---

[1] Mother also had two older daughters from a previous relationship.

[2] Also relevant to the arguments at trial, the decree provided that "[e]ach party shall contact the other parent first should they not be able to care for the child for four (4) or more hours and offer the right of first refusal."

1

a friendly and productive co-parenting relationship for the first few years after their divorce. Their relationship deteriorated in 2019.

[¶6]  In September 2019, Mother filed a petition to modify child support, health insurance, tax deductions, and decision-making authority. Mother first asserted that Father refused to contribute to SL's expenses and requested a recalculation of child support. She also claimed that Father refused to provide health insurance for SL, and argued that if Father would not provide insurance, the decree should be modified to require only Mother to provide insurance, and Mother should claim SL on her taxes every year. Lastly, Mother contended that Father's behavior got SL kicked out of daycare, and because they could not agree on a new daycare facility, Mother requested primary decision-making authority.

[¶7]  Father filed a petition to modify custody in December 2019, alleging a material change in circumstances had occurred since entry of the divorce decree. He contended that Mother had moved in with her boyfriend (Boyfriend),[3] who had a prior domestic violence conviction, and that the two had a volatile relationship. Father feared that child abuse and/or neglect was occurring at Mother's home. Conversely, Father argued, he was in a healthy relationship and was engaged to be married. Father stated that SL had developed "bond[s] of love and affection" with his soon-to-be wife, and her son.

[¶8]  Mother filed a counter petition to modify custody in October 2020, also asserting that a material change in circumstances had occurred. She claimed Father left SL with his now-wife a lot while he traveled for work, and that this caused SL to distance herself from Father. Mother also asserted that Father used fear tactics to parent SL, refused to be flexible with the custody schedule or communicate with Mother regarding SL's well-being, and often sent SL to school without enough food and with a trash bag for a backpack. She argued that the joint custody arrangement was no longer in SL's best interest.

[¶9]  The district court held a two-day trial in March 2021 and heard from several witnesses on each party's side. Father and Mother each claimed to have been SL's primary caregiver since the divorce. But, both agreed that Mother was primarily responsible for arranging SL's medical and dentist appointments, daycare, schooling, and extracurriculars. Both parents expressed love for SL. Mother testified that SL was funny, independent, and inquisitive; and that she enjoyed cooking, dancing, and making art.

[¶10] The court heard much testimony regarding the deterioration of the co-parenting relationship. Father testified that the breakdown in communication began in July 2019 after Mother moved in with Boyfriend. Mother claimed that Father stopped trying to co-parent after Mother initiated this litigation in September 2019. The court also heard

---

[3] Mother's boyfriend is mentioned frequently throughout the opinion and discussed in a criminal context. For ease of reference, and because his identity is not relevant to this appeal, we refer to him as "Boyfriend".

testimony about the parties' inability to agree on a new daycare facility for SL after July 2019.[4]

[¶11]   Father felt that Mother had become inflexible regarding his communication with SL during her parenting weeks, and Mother complained of Father's refusal to switch around their parenting schedule to accommodate family activities.  Mother also took issue with Father's work travel and failure to honor the decree's first right of refusal provision.  Father testified that he was concerned for SL while at Mother's house because Boyfriend had a violent history.  Mother testified that she had known Boyfriend for years and had no concerns about his behavior.  According to Mother, SL had a good relationship with Boyfriend, and the two bonded over music, movies, and Legos.

[¶12]   As to insurance, Father admitted that he did not carry coverage for SL in the first few years after the divorce because he did not read the decree and did not know he was ordered to.  He testified he now has her covered on a "standard-issue medical, dental, vision" plan.

[¶13]   Father called his wife and Boyfriend as witnesses.  Father's wife testified that she loved SL, had a mother-daughter bond with her, and that SL got along well with her son.  She stated that Father and SL had an "unbreakable" bond, and that he usually took her to and from daycare, got her ready for school and dance, did her hair, and helped her with homework.  She also testified to Father's work travel, and established that Father was out of town for 29 days of his parenting time in 2020, during which she cared for SL.  She believed SL enjoyed this time and claimed she facilitated a lot of facetime calls between SL and Father while he was away.

[¶14]   Boyfriend testified that he lived with Mother; their one-year-old son, JB; SL; and his daughter, HB, from a previous marriage.  HB, who lived in Texas, visited for holidays and summer vacation and she and SL got along well.  Boyfriend also had a great relationship with SL.  He usually took her to and from daycare, and he felt that she was comfortable with him.

[¶15]   Boyfriend also testified to his prior conviction.  He and his ex-wife went through a long divorce. One day, during an argument, his ex-wife "became very emotional" and tried to take HB, who was wearing only pajamas, outside into negative-degree weather.  He grabbed the back of his ex-wife's jacket to stop her.  His ex-wife accused him of strangulation of a household member—which he thought was a tactic to gain custody of HB.  Ultimately, he pled guilty to one misdemeanor count of unlawful touch.  He believed

---

[4] After SL stopped attending Building Blocks Child Care Center in July 2019, *see infra* ¶ 19, Mother wanted her to attend The Neighborhood School, a facility that was conducive to Mother's work schedule because it offered before and after school care and could transport SL to and from school.  Father wanted SL to attend the Boys and Girls Club with his wife's son, which cost ten dollars per month for after school care only.  SL went to The Neighborhood School but this remained a point of contention between the parties.

3

he could have resolved the fight in a better manner. He was remorseful because his behavior led to those false accusations and affected his relationship and visitation with HB. When asked whether he threatened his ex-wife "not to get involved in this matter[,]" he replied that he did not. And when asked about other allegations made against him, he denied ever spanking or pinching HB or SL.

[¶16] Mother objected when Father called Boyfriend's ex-wife to testify. Father claimed the ex-wife could impeach Boyfriend's testimony about the events that gave rise to his unlawful touch conviction, his alleged threat pertaining to her involvement in this litigation, and his treatment of HB. Mother argued that her testimony would amount to "prior bad conduct evidence" that was irrelevant to this custody decision. The court agreed with Mother and disallowed the testimony under W.R.E. 608(b) and 403.

[¶17] Father also called a teacher at SL's current daycare and SL's counselor.[5] The teacher testified that SL was smart and intuitive. She claimed that SL seemed chattier and more excited while she was in Father's custody and more reserved while she was with Mother. The counselor testified that SL loved Father, saw him as a safe person, and had a happy demeanor when she talked about him. During SL's initial intake, with Father present, SL told the counselor that Boyfriend pinched her hard on her arm. SL also told her that Mother and Boyfriend argued and screamed a lot. The counselor stated that she reached out to Mother to inform her SL was in counseling, and offered Mother to come in to discuss how they could best support SL. When Mother asked what the counselor discussed with SL, she said she could not reveal that due to confidentiality.

[¶18] Mother called Boyfriend's mother, one of her older daughters, and two of SL's past daycare providers. Boyfriend's mother testified that she lived two houses down from Mother and Boyfriend and observed them often, they were great parents, and SL seemed happy and comfortable in their care. Mother's older daughter testified that Mother was a good parent to SL. She claimed that Mother and Boyfriend sometimes fought, but she was not sure whether they did so in front of SL. She also said that Father's wife often spoke poorly of Mother.

[¶19] The director of SL's former daycare testified that Father was difficult to communicate with. An employee of the same daycare claimed that Father was standoffish and did not like feedback but that Mother was warm, welcoming, and receptive to feedback. The director recalled a time in February 2019 when Father threatened to sue the facility after SL got hit by the door when Father was leaving with her. The employee testified to another 2019 incident when Father became "infuriated" and "started yelling" in front of other teachers and children during pick up hours. That daycare terminated its relationship with SL shortly thereafter.

---

[5] Without telling Mother, Father put SL in counseling to deal with her "emotional issues" about a month prior to the trial.

4

[¶20] In closing arguments, Father, Mother, and the GAL all asserted that a material change in circumstances had occurred. Father and Mother each maintained that granting him/her primary custody was in SL's best interest. The GAL, appointed to represent SL's best interests, recommended that Father be awarded primary physical custody.

[¶21] In its decision letter, the court found a material change in circumstances had occurred in that Father and Mother agreed the current custody arrangement was not working. It then declined to modify custody, concluding that it was in SL's best interest to maintain the existing custody arrangement.[6] Additionally, the court granted Mother's request to have final decision-making authority for SL, denied her request for child support, and found her requests regarding health insurance and taxes moot. Father appealed.

## DISCUSSION

### I. The district court did not abuse its discretion when it declined to modify the custody arrangement.

[¶22]

> We employ a two-step analysis in determining a request for a change in custody or visitation. The first step requires a showing of a material change in circumstances since the most recent custody and/or visitation order. Once that is shown, the court determines whether a change of custody and/or visitation is in the child's best interests.

*Gutierrez v. Bradley*, 2021 WY 139, ¶ 15, 500 P.3d 984, 988 (Wyo. 2021) (quoting *Hays v. Martin*, 2021 WY 107, ¶ 21, 495 P.3d 905, 910 (Wyo. 2021)). "We review a district court's child custody modification ruling for an abuse of discretion." *Id*. (quoting *Hays*, ¶ 21, 495 P.3d at 911).

[¶23] Father does not challenge the district court's material change in circumstances finding.[7] Instead, Father takes issue with the court's finding that a custody modification was not in SL's best interests. He argues that the court's refusal to modify joint custody, after finding that there was a material change in circumstances based on the parties'

---

[6] The court did modify the 2017 decree to reflect the week on, week off custody schedule Father and Mother had been following.

[7] Father and Mother agreed at trial that their joint custody arrangement was no longer working. The district court concluded that, under our precedent, their agreement was sufficient to establish a material change in circumstances since entry of the decree. *See e.g., Johnson v. Clifford*, 2018 WY 59, 418 P.3d 819 (Wyo. 2018). The court expressed concern with this relaxed standard for finding a material change in circumstances in joint custody cases. Because neither party raised this issue at trial or on appeal, we do not address it. *See King v. Cowboy Dodge, Inc*., 2015 WY 129, ¶ 44, 357 P.3d 755, 765 (Wyo. 2015) (declining to address an issue sua sponte that was not pled below nor briefed on appeal).

5

agreement, "makes little sense and is directly contrary to previous [joint custody] rulings of this Court."

[¶24] Father is mistaken. We have never required a district court to modify joint custody just because the parties agreed, and the court found, that a material change in circumstances had occurred. In *Gurney*, we said that "considering the brief span of time between the entry of the divorce decree and the parties' invitations to the district court to reopen the custodial issue, and considering the parties' express invitations to reopen, common sense dictate[d] the district court should reopen the joint custody order and award custody to one parent or the other." *Gurney v. Gurney*, 899 P.2d 52, 55 (Wyo. 1995). There, the parents divorced on July 19, 1993, agreed to joint custody, and were both living in Torrington, Wyoming. *Id.* at 53. Shortly after, the mother moved 60 miles away to Lusk, Wyoming. *Id.* On August 30, 1993, little more than a month after entry of the divorce decree, the father petitioned the court to modify the joint custody arrangement and grant him primary custody. *Id.* The father alleged that the mother had failed to abide by the visitation provisions of the decree, and the mother counter-petitioned, alleging that communications had deteriorated and joint custody was no longer in the best interest of the child. *Id.* This case is easily distinguishable from *Gurney* in that Father and Mother's joint custody arrangement worked for approximately two years and they lived in the same city.

[¶25] Courts retain discretion whether to modify custody. As in every modification analysis, if a court finds a material change, it must then apply the best interest factors to independently determine "what, *if any*, modification is in the children's best interest." *Gutierrez*, ¶ 21, 500 P.3d at 989 (quoting *Ianelli v. Camino*, 2019 WY 67, ¶ 26, 444 P.3d 61, 67–68 (Wyo. 2019)) (emphasis added); *Booth v. Booth*, 2019 WY 5, ¶ 21, 432 P.3d 902, 909 (Wyo. 2019); *see also Kimzey v. Kimzey*, 2020 WY 52, ¶ 32, 461 P.3d 1229, 1239 (Wyo. 2020) ("A material change of circumstances does not necessarily warrant a change of custody. It simply means the court must turn its attention to the best interests of the children." (citations omitted)); *Johnson*, ¶¶ 24–27, 418 P.3d at 826–28.

[¶26] Statutory best interest factors include:

> (i) The quality of the relationship each child has with each parent;
> (ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;
> (iii) The relative competency and fitness of each parent;
> (iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

6

(v) How the parents and each child can best maintain and strengthen a relationship with each other;
(vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;
(vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;
(viii) Geographic distance between the parents' residences;
(ix) The current physical and mental ability of each parent to care for each child;
(x) Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2021). Additionally, Wyo. Stat. Ann. § 20-2-201(c) provides that the court must "consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children." Non-statutory factors a court may consider include sibling separation and a parent's primary caregiver status. *Gutierrez*, ¶ 23, 500 P.3d at 990 (citing *Ianelli*, ¶ 27, 444 P.3d at 68). We have made clear that "[n]o single factor is determinative[.]" *Id.* (quoting *Ianelli*, ¶ 27, 444 P.3d at 68).

[¶27] The record demonstrates that the district court considered all the evidence and weighed the appropriate factors before it declined to modify the parties' custody arrangement. Its decision letter stated that Father and Mother were both competent, fit parents who love and could adequately care and provide for SL. It found that both parents played active roles in supporting and encouraging SL's schooling and extracurriculars but found Mother more credible that she was the primary caregiver. It determined that the parties do a decent job of respecting the other's parenting time, and though it recognized that communication was their biggest issue, it hoped they could work together for SL's sake.

[¶28] While the court suspected Father traveled for work more than he admitted to at trial, it found that it was not contrary to SL's best interests to stay with Father's wife. But, Father's failure to honor the decree's first right of refusal provision meant that the willingness to accept or relinquish care factor favored Mother. The court found Mother's testimony overall more credible and found that Father was evasive in answering certain questions. *See Hays*, ¶ 28, 495 P.3d at 911–12 ("We generally defer to the district court's findings since it is in a better position to assess the witnesses' credibility, weigh the evidence and judge the respective merits and needs of the parties." (quoting *Boyce v. Jarvis*, 2021 WY 80, ¶ 30, 490 P.3d 320, 326 (Wyo. 2021))).

[¶29] The court also determined there was no credible evidence as to any domestic violence. It found Boyfriend's testimony credible and had issues with the counselor's

testimony due to the fact that Father sought her out one month before trial without informing Mother, and because SL's voluntary statement about the pinch lacked context and was made with Father present. It pointed out that the counselor clearly did not consider it an incident of child abuse because she did not report it. The court also noted that while the counselor refused to discuss SL's sessions with Mother due to confidentiality, she disclosed SL's in-session statements to Father's attorney—who proffered what she would testify to—prior to trial. It seemed to the court that she may be biased toward Father because he pays her bills.

[¶30] Additionally, the court noted in its decision letter that it "heard surprisingly little evidence as to [SL's] present well-being." There was no evidence SL was suffering or struggling in school because of the joint custody arrangement. Rather, it seemed SL was bright and did well in school and extracurriculars. It also appeared to the court that she had close relationships with both parents and all of her siblings and enjoyed spending time at both homes. Thus, it concluded, "splitting time equally between the two households appeared to be an ideal arrangement."

[¶31] After weighing the appropriate statutory and non-statutory factors in light of the evidence presented, the court concluded it was in SL's best interest to leave the existing joint custody order in place. Having reviewed the record, we find no abuse of discretion.

## II.    *The district court did not abuse its discretion when it excluded the testimony of Father's witness at trial.*

[¶32] Father also challenges the district court's exclusion of Boyfriend's ex-wife's testimony. "We review a district court's ruling on the admissibility of evidence for an abuse of discretion." *Jontra Holdings Pty Ltd. v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 58, 479 P.3d 1222, 1239 (Wyo. 2021) (quoting *Matter of LDB*, 2019 WY 127, ¶ 43, 454 P.3d 908, 921 (Wyo. 2019)). "We afford considerable deference to a trial court's rulings on the admissibility of evidence, and we will not disturb the trial court's ruling if there is a legitimate basis for it." *Id.* (quoting *LDB*, ¶ 43, 454 P.3d at 921). Father "bears the burden of showing the district court abused its discretion and we will only reverse an erroneous evidentiary ruling if [he] proves the error was prejudicial." *Schell v. Scallon*, 2019 WY 11, ¶ 28, 433 P.3d 879, 888–89 (Wyo. 2019) (citation omitted).

[¶33] After questioning Boyfriend about alleged incidents of abuse and threats, Father attempted to call Boyfriend's ex-wife to impeach him. The court ruled that her testimony was inadmissible under W.R.E. 608(b) and 403:

> I [] believe under 608(b) that you can -- you can question a
> witness about the incident, but then you're not allowed to bring
> in evidence to attempt to prove it up.

You can attempt to question the witness about it, which you did with [Boyfriend]. But I think this is collateral, and I would rule under Rule 403 that it is not permissible.

The court followed up:

I think it was appropriate to allow you to question [Boyfriend] about that incident because domestic violence is a relevant factor under [§] 20-2-201. But I think you're stuck with the answers that he gives, and that it is inappropriate to present extrinsic evidence to try to retry that matter, if you will.

And so that was the basis for the court's ruling. Certainly I think the court has the discretion to deny inquiry into that incident under Rule 403, as it is an unnecessary waste of the court's time in a collateral matter.

[¶34] Father challenges only the W.R.E. 608(b) ruling on appeal, not the W.R.E. 403 ruling. Even if Boyfriend's ex-wife's testimony was admissible under W.R.E. 608(b), the court retained discretion to exclude it under W.R.E. 403. *See Barnes v. State*, 858 P.2d 522, 526–27 (Wyo. 1993) ("W.R.E. 403 provides that the trial court 'may' exclude evidence that is otherwise admissible."); *see also Matter of GGMC*, 2020 WY 50, ¶ 24, 460 P.3d 1138, 1146 (Wyo. 2020) (explaining that "even relevant evidence may be excluded" under W.R.E. 403 (citation omitted)).

[¶35] The standard of review clearly places the burden on Father to prove that the court abused its discretion when it made the W.R.E. 403 ruling, and that the ruling prejudiced him. *Schell*, ¶ 28, 433 P.3d at 888–89. Father has not attempted to prove either. *See O'Donnell v. Blue Cross Blue Shield of Wyoming*, 2003 WY 112, ¶ 8 n.1, 76 P.3d 308, 311 n.1 (Wyo. 2003) ("Generally, an issue not raised or supported with cogent argument in an appellant's brief is considered waived." (citing *Doctors' Co. v. Ins. Corp. of Am.*, 864 P.2d 1018, 1028 (Wyo. 1993))); *see also Snowden v. Jaure*, 2021 WY 103, ¶ 22, 495 P.3d 882, 887 (Wyo. 2021) (declining to consider a contention not supported by cogent argument); *Interest of RR*, 2021 WY 85, ¶ 71, 492 P.3d 246, 265 (Wyo. 2021) (declining to consider an issue not supported by cogent argument).

[¶36] Affirmed.